# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JESSICA VEGA,** | )    **NO. CV 18-10201-KS** |
|          **Petitioner,** | ) |
|     **v.** | )    **MEMORANDUM OPINION AND ORDER** |
| | ) |
| **JANEL ESPINOZA,** | ) |
|          **Respondent.** | ) |
| _____ | ) |

## INTRODUCTION

On December 7, 2018, Petitioner, a California state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. (Dkt. No. 1.) The operative pleading is the Second Amended Petition ("SAP"), which Petitioner filed on January 25, 2019. (Dkt. No. 8.) On June 12, 2019, Respondent filed an Answer to the SAP and lodged with the Court the relevant state court records. (Dkt. Nos. 20, 21.) On July 19, 2019, Petitioner filed a Reply. (Dkt. No. 28.) The parties have consented to the jurisdiction of the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 22.) Briefing in this action is now complete, and the matter is ready for decision.

# PRIOR PROCEEDINGS

On December 20, 2016, a Los Angeles County Superior Court jury convicted Petitioner, as relevant here, of three counts of first-degree residential robbery (Counts One to Three, CAL. PENAL CODE ("Penal Code") § 211), three counts of false imprisonment (Counts Four to Six, Penal Code § 236), and one count of carjacking (Count Seven, Penal Code § 215(a)).[1] (Lodg. No. 2 at 783-85, 788, 791, 794-95.) The jury found true various special allegations, including a principal firearm-use allegation (Penal Code § 12022(a)(1)). (*Id.*) On February 16, 2017, the trial court sentenced Petitioner to 15 years and 8 months in state prison. (*Id.* at 1040-49.)

Petitioner appealed her judgment of conviction. (*Id.* at 1050.) On June 20, 2018, the California Court of Appeal affirmed the judgment in a reasoned, unpublished opinion. (Lodg. No. 14.) Petitioner then filed a Petition for Review in the California Supreme Court (Lodg. No. 18), which summarily denied the petition without comment or citation of authority on October 10, 2018 (Lodg. No. 19).

On December 7, 2018, Petitioner filed a § 2254 Petition in this Court. (Dkt. No. 1.) On December 26, 2018, she filed a First Amended Petition. (Dkt. No. 4.) On January 4, 2019, the Court issued an order ordering Petitioner to show cause why this action should not be dismissed for failure to comply with the applicable pleading standards. (Dkt. No. 5.) On January 25, 2019, Petitioner filed a SAP, raising five grounds for federal habeas relief. (Dkt. No. 8.) On February 5, 2019, the Court issued an order stating that Petitioner's claims in Grounds One and Two appeared to be unexhausted. (Dkt. No. 11.) The Court gave Petitioner four options and ordered her to state how she wished to proceed. (*Id.*) On February 15, 2019, Petitioner filed a notice stating that she wished to voluntarily dismiss her claims in Grounds One and Two. (Dkt. No. 12.) On February 28, 2019, the Court ordered Respondent to file a

---

[1] Petitioner was also convicted of one count of witness dissuasion (Penal Code § 136.1(c)(1)) (CT 799), but she does not challenge that conviction in her habeas petition.

response to the SAP. (Dkt. No. 13.) On June 12, 2019, Respondent filed an Answer. (Dkt. No. 20.) On July 19, 2018, Petitioner filed a Reply. (Dkt. No. 28.)

## SUMMARY OF THE EVIDENCE AT TRIAL

The following factual summary from the California Court of Appeal's unpublished decision on direct review is provided as background. *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence.).

### A. *The Sandas and [Petitioner]*

In 2015, Alvaro [Sanda], who was around seventy years old at the time, lived in a small home in South El Monte with his adult son Michael [Sanda]. Alvaro is an accountant who was being paid approximately $2,000 twice per month, on the fifteenth and last day of the month. Michael did not have a full-time job, but he performed odd jobs to earn money. Alvaro provided Michael free room and board, and also gave him around $40 to $70 per week, in return for performing household chores.

Michael previously was in a relationship with [Petitioner], whom he had known for five or six years. Michael often gave [Petitioner] some of the money he received from Alvaro because he cared about her and liked her, and because he knew she was using the money to help her daughter. [Petitioner] visited Michael at Alvaro's house and stayed in Michael's room. Michael regularly used methamphetamine and [Petitioner] occasionally supplied Michael with drugs.

Alvaro would sometimes discuss finances with Michael, including how much money he (Alvaro) was making and how he could not always afford to help

3

Michael.  Sometimes, [Petitioner] was in Michael's bedroom when Michael had discussions of this nature with Alvaro in the living room.  The living room was close to Michael's bedroom, and [Petitioner] would have been able to hear their conversations.

Michael eventually decided [Petitioner] was using him for his money and, in August 2015, told her he did not want her to come to his house anymore. [Petitioner] reacted poorly to Michael's decision and called him a "loser" and other epithets during a subsequent phone call.  [Petitioner] left three shopping bags full of her possessions in Michael's room.

*B. The Offense Conduct*

Michael communicated with [Petitioner] in early November 2015.  On November 15, 2015, [Petitioner] sent Michael a text message stating[,] "someone's about to jack you guys" and "I know the whole plan."  Michael did not take her statements seriously.

That same night, Michael's friend Normandia drove to Alvaro and Michael's house and parked his truck in the driveway.  Normandia and Michael smoked methamphetamine, and Normandia helped Michael set up a video game console Michael had recently purchased.  Alvaro was also home that night.

At around 11:00 p.m., there was a knock on the door.  Alvaro opened the door to find a woman, later identified as defendant Castanon, standing on his doorstep.  Defendant Castanon told Alvaro her car had broken down and her phone did not work.  She asked if she could have some double-A batteries for her phone.  Alvaro thought this was odd, but he gave her batteries because she looked like she needed help.  Defendant Castanon thanked him and left.

4

Michael and Normandia were in Michael's room and did not see the woman, but Michael asked his father what happened. Alvaro recounted the woman's story, waited by the door for a few minutes to see if she would come back, and then went to bed.

An hour or two later, Normandia decided to go home. When Michael opened the front door for him, he found defendant Castanon and a man standing there. They appeared surprised when he opened the door, and asked if they could borrow his phone. Michael ultimately agreed.

Normandia then walked out of the house toward his truck and unlocked the door with a remote key. As he moved to open the driver's side door, he felt a hard metal object pressed into his back. Normandia turned around and saw two men, one of whom (later identified as defendant Fernando) was pointing a gun at him. Defendant Fernando, now pointing the gun at Normandia's head, ordered him to return to the house.

Michael saw Normandia walking toward him looking scared. As Normandia and the other men approached Michael, defendant Fernando pointed the gun at Michael's face and told him to go into the house.

Once inside, Michael and Normandia were instructed to go to the kitchen. Defendant Fernando pointed the gun at Michael's head three or four times and repeatedly claimed Michael owed him money. Defendant Fernando asked Michael where his father was, but Michael did not answer. Defendants Fernando and Bojorquez then kicked in Alvaro's bedroom door and defendant Fernando pointed the gun at Alvaro.

//

5

Alvaro woke to find someone standing in front of him with a gun. Defendant Fernando told Alvaro to get up and go to the kitchen. Alvaro was scared and had no idea what was happening.

Once back in the kitchen, defendant Fernando said Michael owed him $4,000 and told Alvaro to give him "the check" for that amount. Michael denied owing him any money and Alvaro did not know what he was talking about. Defendant Fernando repeated that he needed $4,000 and Alvaro replied he did not have the money. Defendant Fernando waved his gun around and said they were going to "resolve this." He said he needed the money now and Alvaro better have the money or they would all be in deep trouble. Defendant Castanon similarly asked Alvaro where the check was and conveyed they were serious about needing the money.

While defendants Fernando and Castanon were making these demands, defendant Jorge alternated between standing nearby and walking between the kitchen and Michael's room. Defendant Castanon took the wallet in Alvaro's pocket and instructed defendant Bojorquez to take phones and wallets. Defendant Bojorquez took the keys to Normandia's truck, and Michael's video game console was also taken. Defendant Bojorquez also went through the other rooms and ransacked them. At some point, defendant Fernando asked for the "bags" inside Michael's room. (The evidence presented at trial indicated these bags were the bags [Petitioner] had left in Michael's room.)

Defendant Fernando returned to Alvaro, again asked for $4,000, and asked how long it would take Alvaro to get the money. When Alvaro told him it would take time, defendant Fernando said they would return in two weeks for $2,000. Defendant Fernando told the victims not to call the police and said they (the

robbers) had friends in the neighborhood. All told, the robbers were inside Alvaro and Michael's house around ten to twenty minutes.

Normandia saw defendants Bojorquez, Castanon, and Jorge drive away in Normandia's truck. Defendant Fernando walked away in the same direction. After waiting a few minutes, Normandia went to a neighbor's house and borrowed a phone to call 911.

Phone company records for phone numbers associated with defendants Fernando, Jorge, and [Petitioner] indicate defendant Jorge traveled east away from El Monte shortly after the incident, defendant Fernando traveled east around an hour later, and defendants Jorge, Fernando, and [Petitioner] were all in the San Bernardino area between 4:00 a.m. and 6:00 a.m. on November 16. The records further indicate the cell phones used by defendants Fernando and [Petitioner] were within one mile of each other during that period.

*C. The Investigation and Defendants' Apprehension*

Los Angeles County Sheriff's Department Deputies Ortega and Salas arrived at Alvaro and Michael's home in response to the 911 call. The deputies interviewed the three victims separately. Alvaro and Michael told Deputy Ortega one of the assailants held a black, semi-automatic pistol during the robbery.

Detective Juan Rivera of the Los Angeles County Sheriff's Department was the investigating officer assigned to the case. Detective Rivera interviewed Michael and Normandia (separately) the morning after the robbery. From their demeanor and speech, he concluded they were both under the influence of methamphetamine, which Michael ultimately admitted. During his interview with Michael, Michael described defendant Fernando's gun as a "submachine" gun that

7

looked "a little like an Uzi" and had a long clip. Michael also told Detective Rivera that [Petitioner] might be involved in the crime because of the message she had sent him stating someone was about to "jack" him. Normandia drew a picture of the gun defendant Fernando was holding and gave it to Detective Rivera.

The same morning, Sergeant Manuel Gaitan of the San Bernardino Police Department received a LoJack alert notifying him there was a stolen vehicle in the area. Sergeant Gaitan responded to the location of the vehicle—Normandia's truck. When he arrived, the truck's doors were open, defendant Bojorquez was kneeling near the driver's side, and defendant Castanon was standing on the passenger side. Defendants Bojorquez and Castanon ran when Sergeant Gaitan arrived. Sergeant Gaitan approached the truck and found defendant Jorge laying down in the backseat. Sergeant Gaitan ultimately apprehended all three defendants with assistance from other officers.

Later that day, Detective Rivera interviewed Alvaro. Alvaro described defendant Fernando's gun as black with a long magazine Detective Rivera also spoke to Michael again. Michael told Detective Rivera he had started going through his belongings and realized the three bags of [Petitioner's] possessions that had been in his room were gone. Michael also told Detective Rivera he had looked at [Petitioner's] Facebook profile and had seen a post stating she had recently been with someone named "Fernandez Hernandez."

Detective Rivera reviewed [Petitioner's] Facebook profile and confirmed there was a post indicating [Petitioner] had been with a "Fernandez Hernandez" earlier that month. Detective Rivera then reviewed Fernandez Hernandez's Facebook profile and friends list, which provided a basis to conclude it belonged to defendant Fernando. Defendant Fernando's profile photo featured two firearms

and a magazine that appeared to be loaded.  The friends list reflected defendant Fernando was friends with [Petitioner] and an individual named "Jorge Alberto Hernandes Alcaraz."  (The Facebook profile of Jorge Alberto Hernandes Alcaraz suggested it belonged to defendant Jorge.)

Defendant Fernando was arrested on November 24, 2015.  [Petitioner] was with him when he was arrested.

### D. Post-Arrest Communication from [Petitioner]

On December 2, 2015, Michael used one of Alvaro's cell phones to try to set up a meeting with [Petitioner] to see what she would say to him.  Michael ultimately did not meet with [Petitioner], and he had blocked her number on his phone so it could not receive text messages or phone calls from her.  The next day, [Petitioner] sent a series of text messages to the cell phone number Michael had used to text her the day before.

The first message read:

"Listen, you know what, Imma tell you right now if you testify on anything you do know you got more people . . . watching over your house and your boy too, right, so put it to you like dis, you better drop the charges on two people and I'm not even jokin', you got that DFR is a rat n you have to go wit me MF. . . Oh, n here is what I need to talk to you and who is guilty and not, do you got that so you better meet up with me and soon, and do the right thing 'cause if you only know what I'm going through of your dumb ass n that will go down. We all got kids, family, and you know you have to do the right thing."

//
//

9

A series of messages with similar sentiments followed. One stated, "We will all go down, do you got that? n I be dam I am goin' down for your bullshit." The next read, "So you better meet me ASAP before we run out of time." The final message said, "Cause you don't know me and don't want to get to know me. I'm a bitch n could be hell. Don't forget where I grew up at. And believe my dad know what's up, and you know what I'm not bitch, a snitch, or a rat, but papers are gettin' done."

Petitioner was arrested that evening.

(Lodg. No. 14 at 4-11.)

## PETITIONER'S HABEAS CLAIMS

The Second Amended Petition, as amended by Petitioner's voluntary dismissal of Grounds One and Two, presents the following grounds for habeas relief.

*Ground Three*: The evidence at trial was insufficient to support the jury's finding on the firearm-use allegation. (SAP at 6.)

*Ground Four*: The evidence presented at trial was insufficient to support Petitioner's convictions on Counts One through Seven. (*Id.*)

*Ground Five*: Petitioner was denied due process and a fair trial in violation of the Fourteenth Amendment. (*Id.*)

//
//
//

**STANDARD OF REVIEW**

**I.      The Antiterrorism And Effective Death Penalty Act**

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state prisoner whose claim has been "adjudicated on the merits" cannot obtain federal habeas relief unless that adjudication:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For the purposes of Section 2254(d), "clearly established Federal law" refers to the Supreme Court holdings in existence at the time of the state court decision in issue.  *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011); *see also Kernan v. Cuero*, __ U.S. __, 138 S. Ct. 4, 9 (2017) (*per curiam*) (explaining that circuit precedent, state-court decisions, treatises, and law review articles do not constitute clearly established federal law).  A Supreme Court precedent is not clearly established law under § 2254(d)(1) unless it "squarely addresses the issue" in the case before the state court or establishes a legal principle that "clearly extends" to the case before the state court.  *Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009); *see also Harrington v. Richter*, 562 U.S. 86, 101 (2011) (explaining that it "is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by" the Supreme Court) (citation omitted).

A state court decision is "contrary to" clearly established federal law under § 2254(d)(1) only if there is "a direct and irreconcilable conflict," which occurs when the state court either (1) arrived at a conclusion opposite to the one reached by the Supreme Court on a question of law, or (2) confronted a set of facts materially indistinguishable from a relevant Supreme Court

11

decision, but reached an opposite result. *Murray v. Schriro*, 745 F.3d 984, 997 (9th Cir. 2014) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law under § 2254(d)(1) if the application of Supreme Court precedent was "objectively unreasonable, not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014). Petitioner must establish that "there [can] be no 'fairminded disagreement'" that the clearly established rule at issue applies to the facts of the case. *See id.* at 1706-07 (citation omitted). Finally, a state court's decision is based on an unreasonable determination of the facts within the meaning of § 2254(d)(2) when the federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir.) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 710 (2014). So long as "'[r]easonable minds reviewing the record might disagree,'" the state court's determination of the facts is not unreasonable. *See Brumfield v. Cain*, __ U.S. __, 135 S. Ct. 2269, 2277 (2015). Thus, AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *White v. Wheeler*, __ U.S. __, 136 S. Ct. 456, 460 (2015) (*per curiam*) (internal quotation marks and citation omitted). Petitioner carries the burden of proof. *See Pinholster*, 563 U.S. at 181.

## II.    The State Court Decision Is Entitled To Deference

Petitioner raised her sufficiency of the evidence claims (Grounds Three and Four) on direct review in the California Court of Appeal. (Lodg. No. 5 at 27-34 & 35 (citing Lodg. No. 3 at 19-20).) The California Court of Appeal denied the claims in a reasoned decision on the merits. (Lodg. No. 14 at 22-27, 30-33.) Petitioner then presented the claims to the California Supreme Court in the Petition for Review (Lodg. No. 16 at 14-32), which the California Supreme Court denied summarily without comment or citation to authority (Lodg. No. 19). Thus, § 2254(d) applies, and the Court looks through the California Supreme Court's summary denial to the last reasoned decision – the decision of the California Court of Appeal on direct

review – to determine whether the state court's adjudication of Grounds Three and Four is unreasonable or contrary to clearly established federal law. *See Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013) ("Consistent with our decision in *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991), the Ninth Circuit 'look[ed] through' the California Supreme Court's summary denial of [the petitioner's] petition for review and examined the California Court of Appeal's opinion."); *see also, e.g.*, *Jones v. Harrington*, 829 F.3d 1128, 1136 (9th Cir. 2016) (looking through California Supreme Court's summary denial of a petition for review to the California Court of Appeal's decision on direct review).

## DISCUSSION

Petitioner claims that the evidence was insufficient to support the jury's true finding on the firearm-use allegation, the evidence was insufficient to support the jury's verdict on Counts One through Seven, and she was denied due process and a fair trial as a result of her improperly obtained convictions. (SAP at 6.) Petitioner's claims do not warrant habeas relief and are discussed in turn.

## I. Legal Standards

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When a habeas petitioner challenges the sufficiency of the evidence supporting the jury's verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) (*per curiam*) ("question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality."). *Jackson* does not

require that the prosecutor affirmatively "'rule out every hypothesis except that of guilt.'" *Wright v. West*, 505 U.S. 277, 296 (1992) (citation omitted). "Circumstantial evidence and inferences drawn from it may [also] be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted). When the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326; *McDaniel v. Brown*, 558 U.S. 120, 133 (2010). Ultimately, for Petitioner's claim to be successful, the jury's finding must be "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. The *Jackson* standard applies equally to sentencing enhancements where, as here, the State requires the prosecution to prove the enhancement beyond a reasonable doubt. *See Garcia v. Carey*, 395 F.3d 1099, 1102-04 (9th Cir. 2005). The same standard is used by California courts in determining the sufficiency of the evidence. *People v. Johnson*, 26 Cal. 3d 557, 575-78 (1980) (applying *Jackson*).

When, as here, both *Jackson* and AEDPA apply to the same claims, the claims are reviewed under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (*per curiam*). Accordingly, this Court's inquiry is limited to whether the California courts' rejection of Petitioner's insufficiency of the evidence claims was an objectively unreasonable application of *Jackson*. *See Emery v. Clark*, 643 F.3d 1210, 1213-14 (9th Cir. 2011); *Juan H. v. Allen*, 408 F.3d 1262, 1275 n.13 (9th Cir. 2005).

## II.    Analysis

### A. Petitioner's Sufficiency of the Evidence Claim as to the Firearm-Use Allegation

Petitioner first argues that the evidence at trial was insufficient as to the firearm-use allegation; she avers that she never had a firearm in her possession and was not present at the

crime scene. (SAP at 6.) In state court, Petitioner joined in her co-defendants' argument that there was no substantial evidence that the object her co-defendant possessed was a real handgun and, therefore, the finding of the firearm enhancement must be reversed. (Lodg. No. 5 at 35 (referring to Lodg. No. 3 at 19-20).) The California Court of Appeal disagreed with the co-defendant's argument:

> [D]efendant Fernando brandished an item the victims consistently stated was a gun, though they alternately described it as a semi-automatic pistol or a submachine gun. Defendant Fernando stuck the firearm in Normandia's back and pointed it at Normandia, Alvaro, and Michael at various points. Though none of the victims directly testified they thought the gun was real, defendant Fernando's "own . . . conduct in the course of [the] offense" reasonably supports the jury's determination that he used a firearm. While it is conceivable the item defendant Fernando used during the incident was not a real firearm, "the jury was entitled to take defendant at his word, so to speak, and infer from his conduct that the [gun] was a real, loaded firearm and that he was prepared to shoot the victim[s] with it if [they] did not comply with his demand."

(Lodg. No. 14 at 32 (citations omitted).)

To prove a firearm-use allegation under California law, there must be evidence of a firearm designed to shoot and which gives the appearance of shooting capability. *See People v. Nelums*, 31 Cal. 3d 355, 358-59 (1982). "The character of the weapon may be shown by circumstantial evidence. From testimonial descriptions of the weapon and its role in the commission of the crime, a jury may draw a reasonable inference of guilt. [The r]easonableness of the inference depends upon [the] adequacy of the descriptions." *People v. Hayden*, 30 Cal. App. 3d 446, 451-52 (1973), *overruled on other grounds by People v. Rist*, 16 Cal. 3d 211 (1976) (citation omitted). A "defendant's own words and conduct in the course

of an offense may [also] support a rational fact finder's determination that he used a loaded weapon." *People v. Rodriguez*, 20 Cal. 4th 1, 13 (1999). A threat to shoot someone can reasonably be interpreted "as an admission by [the defendant] of his present ability" to do so. *Id.* at 7, 12. A firearm-use allegation can be proven even where the defendant does not personally wield the firearm. *See, e.g.*, *People v. Garcia*, 28 Cal. 4th 1166, 1177 (2002) ("There is no dispute that an aider and abettor need not personally use or discharge a firearm to be liable.").

The California Court of Appeal's rejection of Petitioner's claim was not objectively unreasonable. As detailed by the Court of Appeal, the evidence demonstrated that Fernando held a hard metal object to Normandia's back when he went to his truck, Normandia described it as a black semiautomatic handgun, and Fernando grabbed Normandia by the back of his shoulder and ordered him to return to the house. (Lodg. No. 3 at 1313, 1315, 1329-30.) Normandia and Michael both testified that Fernando pointed a gun at Normandia's head. (*Id.* at 981, 1315, 1318.) Michael then testified that Fernando pointed the gun at Michael's face and told him to "[g]et into the house." (*Id.* at 925-26, 982.) Alvaro testified that Fernando kicked down the door to his room, pointed a gun at his head, and ordered him to go into the kitchen. (*Id.* at 912-14, 926, 985-86.) Alvaro described the gun as black, and as looking like a handgun that was adjusted to be a submachine gun. (*Id.* at 913.) Jorge also threatened Alvaro by saying that he could "spray the house."[2] (*Id.* at 988.) The victims later told the police that the perpetrators had a black semiautomatic pistol. (*Id.* at 1220, 1275, 1277-78.) Michael also testified that he looked at "Fernandez Hernandez's" Facebook page and saw that the profile picture was an "Uzi-type" gun, which he recognized as the gun that was used in the robbery. (*Id.* at 1001-02, 1005.)

//

//

---

[2] Colloquially, to "spray" means to use an automatic weapon to fire blindly and rapidly, releasing a large number of bullets at one time.

The victims' testimony overwhelmingly supported the inference that Fernando used a real firearm and the jury's true finding on the firearm-use allegation. *See Hayden*, 30 Cal. App. 3d at 452-53 (when robbery victims "testified that the robber pointed and threatened them with a weapon which they variously described as a gun," and that he ordered them to do various tasks, the evidence is sufficient to sustain a finding that the robber used a firearm). And though Petitioner was not present at the crime scene and did not personally use a firearm, she may still be found subject to the firearm enhancement based on her participation in the offense. *See Garcia*, 28 Cal. 4th at 1177. Therefore, the record supports the determination of the California Court of Appeals that sufficient evidence supported the firearm-use allegation. Accordingly, the court's application of the *Jackson* test was not wrong beyond any possibility of fair-minded disagreement. *See Harrington*, 562 U.S. at 103. To the extent Petitioner asks the Court to draw inferences different from those drawn by the jury and reweigh the evidence, that is impermissible. *See Cavazos v. Smith*, 565 U.S. 1, 7 n.* (2011). Accordingly, Petitioner is not entitled to relief based on Ground Three.

### B. Petitioner's Sufficiency of the Evidence Claim as to Counts One Through Seven

Petitioner next argues that the evidence at trial was insufficient to support her convictions on Counts One through Seven (three counts of first-degree residential robbery, three counts of false imprisonment, and one count of carjacking); she avers that she was not present at the crime scene and was not involved in any way with the crime. (SAP at 6.) The California Court of Appeal disagreed with Petitioner's argument:

The evidence presented at trial is sufficient to sustain [Petitioner's] convictions under either an aiding and abetting or conspiracy theory of liability. Michael's testimony established [Petitioner] was previously in some sort of relationship with him, he broke it off, and she was unhappy with his decision. During [Petitioner's] relationship with Michael, she spent time at his home and

Michael and Alvaro occasionally discussed finances, including how much money Alvaro made and when he was paid. Though [Petitioner] was not involved in those conversations, the jury could reasonably infer, given the small size of the house, that [Petitioner] overheard some of those conversations. Similarly, the jury could reasonably infer [Petitioner] had learned details like the days on which Alvaro was normally paid—on the 15th and on the last day of the month—and how much money he made per month—approximately $4,000. Significantly, the defendants that actually carried out the robbery did so on November 15, insisted Alvaro give them "the check," and said they needed $4,000.

None of the victims knew any of the four defendants who invaded the Sanda home on November 15. Michael did, however, know [Petitioner]. And [Petitioner's] Facebook profile and phone contacts indicated she knew defendants Fernando and Jorge and was spending time with defendant Fernando. The jury could reasonably infer [Petitioner] was involved in planning the robbery and told defendants Fernando and Jorge details like where the Sandas live, how much money Alvaro makes, and when he is paid.

Indeed, the text message Michael received just before the robbery is strong evidence [Petitioner] did just that. The day of the incident [Petitioner] sent Michael a message stating someone was "about to jack you guys" and admitting "I know the whole plan." Furthermore, when [Petitioner] and Michael ceased spending time together, [she] left three bags of her possessions in Michael's room. Defendant Fernando asked for the bags inside Michael's room during the robbery. And while most of the Sanda house was ransacked during the incident, those three bags were simply taken.

//
//

18

In addition, cell phone records demonstrated the phones belonging to [Petitioner], Fernando, and Jorge were used in San Bernardino in the early morning hours after the home invasion robbery. Evidence indicated [Petitioner] and Fernando's cell phones were in the same vicinity, permitting an inference that [Petitioner] rendezvoused with defendant Fernando after the robbery.

Cell phone records further demonstrated [Petitioner] sent a number of threatening text messages to Michael after defendant Fernando was arrested and shortly before she was arrested. For example, in one message [Petitioner] wrote, "Imma tell you right now if you testify on anything you do know you got more people . . . watching over your house and your boy too, right . . . you better drop the charges." Other messages stated: "We will all go down, do you got that?"; "So you better meet me ASAP before you run out of time"; and "I'm not bitch, a snitch or a rat, but papers are gettin' done." Detective Rivera testified the latter statement regarding "papers" was a threat to do Michael harm and meant he was being labeled as a snitch. [Petitioner's] text messages telling Michael to drop the charges and threatening him were further evidence the jury could reasonably use to infer she aided or conspired with those who carried out the robbery and was concerned about her criminal liability.

Based on these facts, we additionally conclude there is substantial evidence to support [Petitioner's] convictions for false imprisonment and carjacking under either a conspiracy theory of liability or under the natural and probable consequences doctrine. A rational trier of fact could find the other defendants falsely imprisoned the victims and stole Normandia's car in order to facilitate the successful completion of the robbery, which was all part of the plan as [Petitioner] well knew. Substantial evidence also permitted the jury to find the false imprisonment and carjacking offenses were natural and probable consequences of

19

the robbery. It is reasonably foreseeable that robbing someone's home will involve detaining or falsely imprisoning them, and it is also reasonably foreseeable that robbing a home would involve stealing the car of one of the victims at the residence. In short, "a reasonable person in . . . [Petitioner's] position would have or should have known that the [false imprisonment and carjacking were] a reasonably foreseeable consequence of the [robbery] aided and abetted."

(Lodg. No. 14 at 24-27 (citations omitted).)

Under California law, a defendant who assists another to commit a crime is guilty as an aider and abettor. *See People v. Perez*, 25 Cal. 4th 1219, 1225 (2005). An aider and abettor need not be present during the commission of the offense. *People v. Beeman*, 35 Cal. 3d 547, 554-55 (1984). "The actual perpetrator must have whatever mental state is required for each crime charged," while an aider and abettor must "act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." *People v. Mendoza*, 18 Cal. 4th 1114, 1123 (1998) (citation omitted). "[A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." *Beeman*, 35 Cal. 3d at 560.

A conspiracy requires an agreement between two or more persons with the specific intent to agree and to commit an offense, followed by an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement. *People v. Morante*, 20 Cal. 4th 403, 416 (1999). An "overt act" means any step taken or committed by one or more of the conspirators which goes beyond mere planning or agreement to accomplish the conspiracy's objective. *People v. Jurado*, 38 Cal. 4th 72, 120 (2006). A conspiracy may be

proved by direct or indirect evidence. *People v. Cantu*, 216 Cal. App. 2d 839, 845 (1963). "It is not necessary to prove that the parties met and actually agreed to jointly undertake the criminal action charged." *Id.* "[E]ach member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as a part of their common unlawful design." *People v. Zielesch*, 179 Cal. App. 4th 731, 739 (2009) (citing *People v. Medina*, 46 Cal. 4th 913, 920 (2009)).

The California Court of Appeal's rejection of Petitioner's claim was not objectively unreasonable, and the record supports the determination that the evidence was sufficient to sustain Petitioner's convictions on Counts One through Seven, either under an aiding and abetting or conspiracy theory of liability. The evidence showed that Fernando, the gunman, was Petitioner's boyfriend; Michael testified that the day after the crimes, he looked at Petitioner's Facebook page and saw that Petitioner was with "Fernandez Hernandez." (Lodg. No. 3 at 1000-01, 1279, 1593-94.) "Fernandez Hernandez" was Fernando's Facebook page. (*Id.* at 1000-02, 1280.) Michael also saw a man he believed to be Fernando in the background of one of Petitioner's Facebook photos. (*Id.* at 1002.) At one point, when Petitioner was staying with Michael, Petitioner said "Fernando" was coming over, and asked Michael to stay inside the house. (*Id.* at 1287-88.) Fernando's Facebook friends included Petitioner and Jorge, (*id.* at 1595), and Jorge's Facebook friends included Petitioner and "Fernandez Hernandez" (*id.* at 1596).

Cell phone evidence showed that Petitioner, Bojorquez, and Jorge were near the crime scene between 4:00 a.m. and 6:00 a.m. (*Id.* at 1561, 1563, 1577, 1605.) Shortly thereafter, Bojorquez, Jorge, and Castanon were apprehended nearby with Normandia's truck. (*Id.* at 1507-13.) Additionally, the evidence showed that Fernando and Castanon demanded a $4,000 check during the robbery, which corresponded with Alvaro's monthly paycheck and the amount Alvaro had discussed with Michael while Petitioner stayed at their home. (*Id.* at 916-

18, 986, 989, 1288-89, 1320, 1331.)  During the robbery, Fernando asked for and took bags of Petitioner's belongings that had been in Michael's room for months.  (*Id.* at 991, 1252-53, 1322.)  The bags were later recovered from Normandia's truck.  (*Id.* at 1341-42.)

Finally, Petitioner's text to Michael before the crime that she knew "the whole plan" and that "someone's about to jack you guys" (*id.* at 972), and her threats against Michael after the crimes (*id.* at 1854-55), were compelling circumstantial evidence connecting her to the crimes as either an aider and abettor or a coconspirator.  As the California Court of Appeal found, the evidence supported Petitioner's convictions because "[a] rational trier of fact could find the other defendants falsely imprisoned the victims [Counts Four through Six] and stole Normandia's car [Count Seven] in order to facilitate the successful completion of the robbery, which was all part of the plan as [Petitioner] well knew.  Substantial evidence also permitted the jury to find the false imprisonment and carjacking offenses were natural and probable consequences of the robbery."  (Lodg. No. 14 at 26.)  Accordingly, the California Court of Appeal's rejection of Petitioner's sufficiency of the evidence claim was not contrary to, nor an unreasonable application of, *Jackson*.  Therefore, relief is not warranted on Ground Four of the Petition.

## C. Petitioner's Due Process and Fair Trial Claim

Petitioner's final argument is that she was denied due process and a fair trial.  It is well-settled that "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."  *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).  Petitioner does not expand on this argument or provide specific facts to support it.  She makes the argument in a single line without reference to the record or any document.  Therefore, Petitioner is not entitled to relief on Ground Five of the Petition.  *See Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (holding that district court properly rejected conclusory claim that was argued in a single page without reference to the record or any other documents).

To the extent Petitioner argues that she was deprived due process and a fair trial because the evidence was insufficient to sustain the firearm-use allegation and her conviction on Counts One through Seven, her claim fails. For the reasons discussed above, evidence adduced at trial was sufficient to support the firearm enhancement and Petitioner's conviction on Counts One through Seven.

## ORDER

For all of the foregoing reasons, IT IS ORDERED that (1) the Second Amended Petition is denied; and (2) Judgment shall be entered dismissing this action with prejudice.

DATED: September 20, 2019

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE